**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PLANTRONICS, INC., | Case No.: 5:07-cv-06038-PSG |
| Plaintiff, | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | **(Re: Docket Nos. 103 and 107)** |
| AMERICAN HOME ASSURANCE COMPANY and THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | |
| Defendants. | |

Before the court are the parties' cross-motions for summary judgment.[1]  These motions are opposed.  The parties appeared for a hearing on the motions.[2]  After considering the arguments at the hearing and in the papers, the court GRANTS Plaintiff Plantronics, Inc.'s motion for partial summary judgment and DENIES-IN-PART the motion of Defendant American Home Assurance Company and The Insurance Company of the State of Pennsylvania.

---

[1] *See* Docket Nos. 103 and 107.

[2] *See* Docket No. 120.

United States District Court
For the Northern District of California

# I. BACKGROUND

**A.      The Underlying Actions**

This case stems from American Home and ICSOP's denial of insurance coverage for seven law suits filed against Plantronics between October 2006 and July 2007.[3]  Plantronics urges that American Home and ICSOP owed a duty to defend Plantronics in the underlying actions and subsequently breached that duty.  American Home and ICSOP disagree that any duty to defend was owed.[4]

On August 3, 2007, a consolidated first amended complaint was filed.[5]  "The underlying actions concern the use of 'Bluetooth Headsets' marketed, manufactured and distributed by Plantronics. These headsets permit wearers to utilize a mobile telephone without holding the telephone next to the face and without the necessity of wires connecting the telephone to the headset."[6]  The underlying actions allege that the Bluetooth Headsets can cause noise induced hearing loss and the packaging lacks adequate warnings about such potential hearing loss.[7]  The claims in the underlying actions "seek damages for economic injury and do not seek damages for any physical injury that may have been sustained by Class members."[8]  The putative class also alleged that the Bluetooth Headsets were defectively designed and unfairly marketed.[9]  The

---

[3] *See* Docket No. 94 at ¶ 8(a)-(g).

[4] The question of whether any duty was owed is a question of law and the parties agree there are no disputed material facts precluding summary judgment.

[5] *See* Docket No. 94-12, Ex. L.

[6] Docket No. 94 at ¶ 10.

[7] *See id.* at ¶ 46 ("The design, manufacture, distribution and sale by Defendants of the Headsets without adequate warning labels that the Headsets produce decibel levels harmful to the human ear constitutes unfair business practices. As a result of Defendants' conduct, numerous consumers have paid for an unsafe or unusable product which they believed could be safely used for extended periods of time.").

[8] *See id.* at ¶ 62(g).

[9] *See id.* at ¶ 54 ("Plantronics affirmatively represented that the Headsets are warranted to be free from 'defects in materials and workmanship.'  This representation was and is false.  The Headsets

2

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

defective design of the Bluetooth Headsets allegedly constitutes a breach of warranty entitling purchasers to a refund of the purchase price of the product.

**B.      The Relevant Insurance Policies**

Between 2003 and 2007, Plantronics paid AIG roughly $600,000 in insurance premiums in exchange for AIG's issuance of commercial general liability ("CGL") policies.[10]  The policies' CGL coverage includes promises to "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury" to "which this insurance applies."[11]  The insurers also agreed to "defend the insured against any suit seeking those damages."[12]  The policies define a "suit" as "a civil proceeding in which damages because of 'bodily injury" to "which the insurance applies are alleged."[13]  The policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time."[14]

---

are defective and cannot safely be used for their intended purpose.  The materials and workmanship of the product cause the product to s produce unsafe decibel levels under normal consumer usage."); *see also id.* at ¶¶ 67-87.

[10] *See* Docket Nos. 94-1-4, Exs. A-D.

| Docket No. | Policy No. | Company Providing Coverage | Coverage Period | Premium | Per Occurrence Limit | General Occurrence Limit |
|---|---|---|---|---|---|---|
| 94-1, Ex. A | GL 359-79-82 | ICSOP | 6.30.2003 to 6.30.2004 | $150,000 | $1M | $2M |
| 94-2, Ex. B | GL 382-89-16 | ICSOP | 6.30.2004 to 6.30.2005 | $130,548 | $1M | $2M |
| 94-3, Ex. C | GL 382-94-49 | American Home | 6.30.2005 to 9.30.2006 | $179,127 | $1M | $2M |
| 94-4, Ex. D | GL 721-75-41 | American Home | 9.30.2006 to 9.30.2007 | $173,786 | $1M | $2M |

[11] *See, e.g.*, Docket No. 94-1, Ex. A at Sec. I., Coverage A, ¶ 1.a.

[12] *Id.* at Sec. I., Coverage A, ¶ 1.a. and Sec. I., Coverage B, ¶ 1.a.

[13] *Id.* at Sec. V., ¶ 19.

[14] *Id.* at Sec. V., ¶ 3.

3

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

## II. LEGAL STANDARDS

### A.     Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15]  Material facts are those that may affect the outcome of the case.[16]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[17]  When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party.[18]

### B.     The Law of the Case Doctrine

"The law of the case doctrine, a judicial invention, aims to promote the efficient operation of the courts."[19]  "It generally preludes a court from reconsidering an issue decided previously by the same court or by a higher court in the identical case.  The issue in question must have been decided explicitly or by necessary implication in the previous disposition."[20]  "Application of the law of the case is discretionary."[21]  "The law-of-the-case doctrine applies with equal force to

---

[15] Fed. R. Civ. P. 56(a).

[16] *See Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[17] *See id.*

[18] *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (the "court must review the evidence submitted in support" of each cross-motion).

[19] *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (citing *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990)).

[20] *Id.* (citing *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000)).

[21] *United States v. Jones*, 532 F. App'x 769, 772 (9th Cir. 2013) (citing *Hall*, 697 F.3d at 1067 (9th Cir. 2012)).

4

interlocutory orders that are not immediately appealable."[22]  "A court may depart from the law of the case if: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) [if applicable] the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result."[23]

### III. DISCUSSION

**A.      The Law of the Case Applies**

On October 20, 2008, Judge Trumbull, the undersigned's predecessor in this case, addressed the question of whether or not the duty to defend had been triggered in the context of a defendant insurer's motion to dismiss.[24]  Judge Trumbull held that because, "at a minimum, the Underlying Actions potentially seek damages within the coverage of the policy, dismissal" was not

---

[22] *United States v. Kohring*, Case No. 3:07-CR-00055-JWS, 2008 WL 1746700, at *4, (D. Alaska Apr. 14, 2008) (citing *Pit River Home and Agr. Co-Op, Ass'n v. United States*, 30 F.3d 1088, 1097 (9th Cir. 1994)).

The Association's argument that the law of the case doctrine does not apply to interlocutory orders which are not immediately appealable is meritless. The law of the case doctrine is a discretionary one created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest.  Law of the case is not synonymous with preclusion by final judgment. *See* 18 Wright, Miller & Cooper, at 798 (1981), 603 (Supp. 1993).

*See also United States v. Real Prop. Located at Incline Vill.*, 976 F. Supp. 1327, 1354 (D. Nev. 1997)

The law of the case doctrine becomes meaningless, at least in the context of a single action, in a single court, before a single judge, if the court accords its own prior rulings no deference.  Were it otherwise, a party dissatisfied with a prior ruling could reargue the point, without end, and without new evidence or new controlling law.  The well-established exceptions to the law of the case doctrine—new evidence, new controlling law, clear error and manifest injustice—provide ample room for adjustment to prior rulings during the course of litigation.  Where none of these exceptions applies, the law of the case doctrine "protects the ability of the court to build its final judgment by cumulative rulings, with reconsideration or review postponed until after the judgment is entered."  1B James W. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 0.404[4.–1] (1995).

[23] *United States v. Scrivener*, 189 F.3d 825, 827 (9th Cir.1999) (quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997)); *see also Hopkins v. Bonvicino*, Case No. 3:05-cv-02932-JSW, 2010 WL 3743562, at *2 (N.D. Cal. Sept. 17, 2010).

[24] Although Atlantic Mutual Insurance Company moved to dismiss and thus raised the issue, Atlantic Mutual's policy for all pertinent purposes was identical to the policies implicated in the summary judgment motions here.

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

warranted.[25]  In her order Judge Trumbull found the "Underlying Actions clearly informed" the defendant insurers "that claims had been made that Plaintiff's Headsets can cause noise induced hearing loss."[26]  That hearing loss created two grounds to trigger the insurer's duty to defend.

First, even absent any findings in "the Underlying Actions that actual bodily injury occurred to any specific individual" it was at least arguable that Plantronics would be obligated to pay "because of" bodily injury "because, but for the potential for bodily injury caused by the Bluetooth Headsets, there would be no viable claims for defective design, unfair marketing or breach of warranty.  Thus, any damages" Plantronics was obligated to pay "are at least arguably 'because of' bodily injury."[27]

Second, any "of the  plaintiffs in the Underlying Actions could amend his or her complaint at any time to allege that he or she has suffered damages due to having suffered noise induced hearing loss as a result of using the Bluetooth Headsets they purchased;" and any "such amended complaint would include covered claims."[28]  Judge Trumbull relied upon the California Supreme Court's holding in *Gray v., Zurich Insurance Co.* for the proposition that "there was a duty to defend even in a case where the complaint was never amended to include a covered cause of action and the underlying judgment found liability only for conduct that was excluded from coverage."[29]

Because "the issue in question" – the duty to defend – was "decided explicitly" by this same district court, the undersigned has the discretion to apply the law of the case.  That the duty to defend was addressed during a motion to dismiss does not preclude application of the law of the case.[30]  Nor is any ground to depart from the law of the case applicable here.  Judge Trumbull's

---

[25] Docket No. 49 at 5.

[26] *Id.* at 4.

[27] *Id.*

[28] *Id.*

[29] *Id.* (citing *Gray v. Zurich Insurance Co.*, 65 Cal. 2d 263 (1966))

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

decision was not "clearly erroneous," nor does an "intervening change in the law" or a "manifest injustice" require a different result.  The precedent now cited by the insurers issued in 2002 and was available to the parties and the court in 2008.  No manifest injustice is created by requiring the insurers to cover the cost of defense in this case – Plantronics paid close to $600 k in premiums to those same insurers.

**B.      American Home and ICSOP Owed Plantronics a Duty to Defend the Underlying Actions**

Even if the law of the case did not bind the court, the court concludes that Judge Trumbull's initial decision that Plantronics was owed a duty to defend was substantively correct.

Defendants urge Judge Trumbull's prior holding is erroneous because her reliance on *Gray* for the proposition that an insurer "must defend a suit which potentially seeks damages within the coverage of the policy"[31] did not confront *Low v. Golden Eagle Ins. Co.*, a 2002 California Court of Appeal decision, that curtails the "sweep of the rule" stated in *Gray* by prohibiting an insured party from "speculating about unpled causes of action." [32]  In *Low* the court considered an insured party's contention that an underlying complaint could "easily have been amended to assert" certain claims which would have brought the complaint "squarely within" the insured party's "policy coverage and support[ed] a duty to defend."[33]  The court rejected the insured's argument on its facts, and explained the broad governing standard in *Gray* – "the duty to defend is excused only where 'the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy'" coverage[34] –  "is qualified by the commonsense proposition that an insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding

---

[30] *See supra* note 22.

[31] *Gray*, 65 Cal. 2d at 265.

[32] *Low v. Golden Eagle Ins. Co.*, 99 Cal. App. 4th 109, 114 (2002)

[33] *Id.* at 112-13.

[34] *Id.* at 113.

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

potential liability or ways in which the third party claimant might amend its complaint at some future date.  Thus, the issue is what facts the insurer knew at the time insureds tendered the defense of the underlying lawsuit, both from the allegations on the face of the third party complaint, and from extrinsic information available to it at the time; and whether these known facts created a potential for coverage under the terms of the policy."[35]

In her order Judge Trumbull correctly pointed to allegations in the complaint putting the insurer on notice of the "potential for coverage under the terms of the policy."[36]  Unlike the complaint in *Low* which only set forth a single paragraph laying out allegations particular to the potentially covered claims,[37] the underlying actions in this case go to great length to describe the noise-induced hearing loss risk engendered through extensive use.[38]  Because allegations in the

---

[35] *Id.* (quoting *Gunderson v. Fire Ins. Exchange*, 37 Cal. App. 4th 1106, 1114 (1995)  (brackets deleted and punctuation modified)); *see also Hurley Construction Co. v. State Farm Fire & Casualty Co.*, 10 Cal. App. 4th 533, 538 (1992) ("Our Supreme Court, anticipating imaginative counsel and the likelihood of artful drafting, has indicated that a third party is not the arbiter of the policy's coverage.  A corollary to this rule is that the insured may not speculate about unpled third party claims to manufacture coverage." (citations omitted)).

[36] *Id.*

[37] *Low*, 99 Cal. App. 4th at 112.

> [T]he great bulk of the 17–page pleading is devoted, not to allegations respecting the named plaintiff and her asserted injuries, but to class action allegations. Of the 61 paragraphs of allegations in the *Perez* complaint, only one—paragraph 6—sets forth allegations particular to Ms. Perez and unrelated to class action issues.
>
>> Plaintiff Yolanda Perez is an adult resident of the County of San Diego in the State of California.  During the class period stated herein, plaintiff Yolanda Perez has purchased and consumed Metabolife 356 which were [sic] manufactured and distributed by the defendants named herein, without disclosure to her that these diet drugs were extremely dangerous to her health.

[38] *See* Docket No. 94-12 at ¶¶ 4, 6 and 25-36.

> 4.  Bluetooth Headsets produce sounds exceeding the scientifically identified danger threshold of 85 decibels, with sound often peaking in excess of 100 decibels.  Exposure to sounds emitted from the Headsets at these decibel levels over an extended period of time, can cause serious and permanent hearing loss.  Even with normal and intended use, Defendants' Headsets put user at risk of hearing loss.
>
> 6.  Just as a car that can be driven safely only a few minutes at a time has less value than a car that can safely be driven for hours at a time, the value of a Bluetooth Headset is greatly diminished by the risk of hearing loss that is present with extended use of the product.

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

Millions of consumers have sustained monetary injury because they have purchased products that cannot safely be used in the intended and advertised manner.

25.   Noise-induced hearing loss is the slow loss of hearing caused by unsafe levels of noise.  Hearing loss happens when unsafe levels of noise hurt the hair cells in the inner ear.  Noise-induced hearing loss is ·nerve deafness which lasts forever.  There is no treatment, no medicine, no surgery, and no device which can correct hearing once damaged by noise.

26.   As explained by the National Institute on Deafness and Other Communication Disorders ("NIDOCP"), hearing depends on a series of events that change sound waves into electrical signals that the auditory nerve carries to the brain.  Sound waves enter the outer ear and travel ~rough the ear canal, which leads to the eardrum.  The eardrum vibrates from incoming sound and then sends the vibrations to three bones in the middle ear, the malleus, incus, and stapes.  These bones then amplify the sound and send the vibrations to the inner ear, or cochlea.  The vibrations cause fluid inside the cochlea to ripple and travel in waves along the basilar membrane.  Hair cells sit atop the basilar membrane.  The motion uses bristles; or stereocillia atop the hair cells to bump against another overlying membrane.  As the bristles move, pore-like channels on their surface open, allowing chemicals that generate sound to rush in.  The auditory nerve carries these signals to the brain, which translates it into sound recognizable by humaris. *See* NIDOCD; *Noise-Induced Hearing Loss* (May 2007), available at www .niqcd.nih.gov/healthlhearinglnoise.asp.

27.   Dangerous Decibels, a public health partnership for the prevention of noise induced hearing loss, advises the public that "[a] dangerous sound is anything that is 85 dB (sound pressure level - SPL) or higher."  *See* Dangerous Decibels, *Information Center: Hearing Loss* (June 22, 2007), available at www.dangerousdecibels.org/hearingloss.cfm.  The organization further explains that "[o]f the roughly 40 million Americans suffering from hearing lost, 10 million can be attributed to noise-induced hearing loss (NIHL).  NIHL can be caused by a one-time exposure to loud sound as well as by repeated exposure to sounds at various loudness levels over an extended period of time.  *Id.*

28.   Exposure to a time weighted average decibel level by itself can cause harm.  The National Institute for Occupational Safety and Health ("NIOSH") contends that exposure to sound averaging at 85 decibels for more than 8 hours is hazardous.  *See* NIOSH, *Criteria for a Recommended Standard: Occupational Noise Exposure* (June 1998), available at www.dangerousdecibels.org/hearingloss.cfm.

29.   According to NIOSH, each three decibel volume increase reduces the safe exposure time by half, which reflects the logarithmic nature of the decibel scale.  In other words, if a headset set on the higher volume level produces decibel levels of 91 decibels, noise-induced hearing loss statistically develops if the headset is used for more than two hours a day.  At 94 decibels, noise-induced hearing loss statistically develops if the headset is used for more than one hour a day.  At 103 decibels, noise-induced hearing loss statistically develops if the headset is used for more than 7 ½ minutes per day.

30.   Noise-induced hearing loss can happen gradually over time and does not cause pain.  Consequently, many people are unaware that noise-induced hearing loss is occurring until it is too late.  Because noise-induced hearing loss is an insidiously deve1oping hearing impairment damage occurs prior to the point at which it is perceived.

3l.   Noise-induced hearing-loss can also result because an individual has become accustomed to a particular sound level.  As the individual gradually suffers hearing loss, in an effort to compensate for the decrease in ability to hear, the individual unwittingly increases the volume of a device in order to hear the sound produced and thereby compounds the injury.

32.   Defendants' B1uetooth Headsets produce sound directly into the ear canal exceeding 85 decibels with sound often peaking above 100 decibels.  For example, in a test recently performed by the American Speech-Hearing Language Association ("ASHLA"),

9

United States District Court
For the Northern District of California

underlying actions traced covered claims that could be added through amendment, the underling

complaints amendment to seek damages because of bodily injury was not speculative.[39]  Because

the insurers were on notice of a possible amendment creating "a potential for coverage under the

---

Motorola's H700 Headset produced decibel levels of up to 106 decibels.  *See* ASHLA, *Popular Technology Unpopular with Ear Hair Cells* (February 28, 2006), available at www.asha.org/about/news/2006/techdamage.htm.

33.   According to the standards promulgated by NIOSH and Dangerous Decibels, a person statistically develops noise induced hearing loss if exposed to sounds over 100 decibels for between only 3 and 4 minutes a day.  Defendants, however, have each marketed their Headsets as having "talk times" of multiple hours.

34. Bluetooth headsets have no mechanism that quantities the noise output levels or signals when the decibel levels exceed safe ranges.  Consequently, there is no way for a consumer who wants to limit the noise output to a certain decibel level to do so reliably.  That is, because of the products' design, a consumer cannot determine, without resorting to scientific testing the decibel level of the sound being emitted from the Headset.

35.   Because Bluetooth Headsets transmit sound to only one ear, extraneous sound from the environment is simultaneously being heard by the Headset user from the other ear.  Such ambient sound makes it difficult for the Headset user to isolate and hear the sound being transmitted over the Headset.  The one ear design of the Headset thus required the user to maximize the volume of the Headset in order to overcome the extraneous noise being heard in the other ear.

36.   The in-ear or "ear bud" style Bluetooth Headsets that sit in the ear, as opposed to on the ear, are particularly dangerous to consumers because of their close proximity to the ear canal.  Each of the defendants produces in-ear Bluetooth Headsets.  Examples of these in-ear Bluetooth Headsets include Plantronic's Discovery 610, Jabra's BT500, and Motorola's H9. Miniblue.

[39] Plaintiff's purported disavowal of bodily injury claims is not dispositive.  The court will not permit the insurer to duck coverage simply because the complainants sought the tactical advantage of bringing their claims through a class action.  *See Dobrin v. Allstate Ins. Co.*, 897 F. Supp. 442, 444 (C.D. Cal. 1995).

Allstate argues that it is permitted to rely on Raitt's statement that he did not intend to amend his cross-complaint in determining that the possibility of coverage under the policy does not exist.  As a matter of policy, however, the insurer cannot avoid coverage simply because the complainant seeks a tactical advantage in the lawsuit.  The facts here clearly demonstrate that Raitt may have changed his mind and amended his cross-complaint at any time to allege such causes of action.  It also is possible to prove such causes of action at trial and then seek leave to amend the cross-complaint to conform it to the evidence adduced at trial.

A mere statement by the complainant that he does not intend to make such a claim is insufficient to establish as a matter of law that such a claim does not exist.  Only in the absence of facts supporting such a claim could Allstate have relied upon such extrinsic information.

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

terms of the policy,"[40] the insurers were duty-bound to defend Plantronics in the underlying actions.

In sum, because (1) the law of the case applies and (2) Judge Trumbull's decision was not clearly erroneous, partial summary judgment is warranted in favor of Plantronics.[41]  Because Defendants withheld policy benefits from Plantronics based on a legitimate dispute of their liability under California law, no reasonable jury could find Defendants acted in bad faith by denying coverage for Plantronics' defense to the underlying actions.[42]  Summary judgment in favor of Defendants on Plantronics' claim for breach of the implied covenant of good faith and fair dealing is warranted.[43]

**IT IS SO ORDERED.**

Dated: May 30, 2014

PAUL S. GREWAL
United States Magistrate Judge

---

[40] *See supra* note 34.

[41] Even if the duty to defend in this case were a close call – which it is not – the insurers would still owe a duty to defend Plantronics. *See National Cas. Co. v. Launch Media, Inc.*, 220 Fed. Appx. 527, 529 (9th Cir. 2007) ("Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor.").

[42] *See CalFarm Ins. Co. v. Krusiewicz*, 131 Cal. App. 4th 273, 286-87 (2005).

"'The mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability.'  Without more, such a denial of benefits is merely a breach of contract.  Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors.  Thus, before an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted unreasonably or without proper cause.  However, when there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal. App. 4th 335, 346-347 (2001).

If the conduct of the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant. *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973-974 (2003). (selected citations omitted and modified for clarity).

[43] Defendants' motion for summary judgment as to Plantronics' breach of contract and related declaratory relief claims is DENIED.

11

Case No. 5:07-cv-06038-PSG
ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California